File Name:  05a0995n.06
Filed:  December 20, 2005

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

No.  05-5084

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

BRIDGESTONE/FIRESTONE   NORTH
AMERICA TIRE, LLC,

      Plaintiff-Appellee,

v.

HARBORSIDE CAPITAL GROUP, LLC,

      Defendant-Appellant,

HARBORSIDE CAPITAL, LLC,

      Defendant-Appellant.

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE MIDDLE
DISTRICT OF TENNESSEE

_____/

Before:     MARTIN, COLE, and McKEAGUE, Circuit Judges

     BOYCE F. MARTIN, JR., Circuit Judge.  This case arises out of a contract dispute between Bridgestone/Firestone North American Tire and Harborside Capital Group.  Harborside attempted to purchase and then lease to Bridgestone three power generators to be used in Bridgestone's plant in Wilson, North Carolina.  Bridgestone later decided to purchase the generators directly from the manufacturer.  The district court granted summary judgment for Bridgestone and Harborside now appeals.  For the following reasons, we AFFIRM the district court's judgment.

I.

In early 2003, Bridgestone decided that its Wilson, North Carolina plant would need additional power generation equipment. It initially approached PowerSecure to purchase three power generators. Bridgestone, however, did not anticipate having the 1.9 million dollars necessary to make the purchase, so in April, PowerSecure put Bridgestone in contact with United Financial of Illinois for financing. Bridgestone scrapped this lease plan after United Financial required Bridgestone to disclose its financial statements.

In June, Bridgestone contacted Harborside Capital Group for financing. Harborside was willing to accept the general terms of the United Financial lease agreement without reviewing Bridgestone's financial statements. On June 9, Harborside sent Bridgestone a "Proposal" for the upcoming lease agreement, which required a signature from Bridgestone beneath the words "Agreed and Accepted." Bridgestone signed the Proposal on June 19. Within the Proposal, there was a security deposit clause:

> [Bridgestone] shall pay [Harborside] a Security Deposit equal to Two (2%) percent of the Equipment Cost upon the acceptance of this proposal which upon closing shall be applied to the rent due under the Lease. In the event [Harborside] delivers a commitment to [Bridgestone] and [Bridgestone] does not close the transaction the entire Security Deposit will become non-refundable. If, however, [Harborside] is unable to deliver a commitment to [Bridgestone] reasonably consistent with the terms of this proposal, then [Harborside] will refund the Security Deposit to [Bridgestone].

Bridgestone subsequently paid the $38,000 security deposit to Harborside and Harborside arranged the necessary funding for the lease.

On July 14, Harborside sent Bridgestone a "Commitment" to the terms of the lease. This document stated, however, that it was "subject to the execution of mutually acceptable lease documentation." The terms of the Commitment were virtually identical to those in the Proposal.

The Commitment did reflect that Bridgestone paid the $38,000 and reiterated that "In the event [Bridgestone] does not close the transaction the entire Security Deposit will be non-refundable." Bridgestone signed the Commitment on July 21.

Beginning in late July and continuing through August, PowerSecure informed Bridgestone that it had started building the generators and that the necessary equipment was ordered. Bridgestone and Harborside dispute how close they were to signing the actual lease agreement in August, but both parties agree that discussions were ongoing and that the parties were close to signing an agreement as of August 22. In September, Bridgestone reassessed its financial situation and decided that it was now feasible for it to purchase the generators directly from PowerSecure without Harborside's leasing agreement. On September 25, Bridgestone submitted a purchase order for the generators. Upon learning of the purchase, Harborside demanded that Bridgestone comply with the requirements of the lease agreement, while Bridgestone insisted there was no such agreement.

When Harborside threatened litigation against Bridgestone for breach of contract, Bridgestone preemptively brought this suit for declaratory judgment against Harborside seeking a declaration that Bridgestone had fulfilled its obligation to Harborside by forfeiting the $38,000. Harborside brought several counter-claims against Bridgestone for breach of contract, conversion, restitution/disgorgement of the unjust gain, fraud in the inducement, breach of duty of good faith and fair dealing, breach of reliance, and constructive trust. Both sides filed cross-motions for summary judgment and on November 10, 2004 the district court granted summary judgment in favor of Bridgestone.

II.

*A. Subject Matter Jurisdiction and Choice of Law*

This case was properly filed in the district court based on diversity jurisdiction. 28 U.S.C. § 1332. The parties involved are completely diverse and the amount in controversy exceeds $75,000. Based on the *Erie* doctrine, when a federal court sits in diversity, the court must decide which state's laws are the appropriate laws to apply and must apply those laws as if the case was being heard in the courts of that state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Where there is a dispute over which state's laws should apply, the federal court must apply the choice of law rules of the forum state. *MacDonald v. General Motors Corp.*, 110 F.3d 337, 341 (6th Cir. 1997).

In Tennessee, the forum state for this dispute, the choice of law rule for contract disputes is *lex loci contractus*, the contract is governed by the law of the place where the contract was made. *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 466 (Tenn. 1973). We find, as the district court did, that both contract documents in this case were sent to North Carolina, signed by Bridgestone's representatives in North Carolina, and were intended to be performed in North Carolina. Therefore, the contract was made in North Carolina and North Carolina law applies to the interpretation of those documents.

*B. Personal Jurisdiction*

Harborside has claimed that the district court in Tennessee did not have personal jurisdiction over Harborside Capital, LLC, a New Jersey corporation. We review a personal jurisdiction determination *de novo*. *City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399

F.3d 651, 664 (6th Cir. 2005). In order to comport with "traditional notions of fair play and substantial justice," a defendant must have minimum contacts with a forum state in order to be brought before that state's district court. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). For a district court to find minimum contacts, "the Defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). To have such an expectation, a defendant must "purposefully avail [] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

There are two named Appellants: Harborside Capital, LLC and Harborside Capital Group, LLC. On appeal, both appellants argue that Harborside Capital has insufficient contacts with Tennessee and therefore there is no personal jurisdiction. However, the combined appellants argued below that Harborside Capital Group is the appropriate party in this case, not Harborside Capital and, therefore, personal jurisdiction over Harborside Capital is inconsequential. Additionally, Harborside Capital Group waived its personal jurisdiction when it failed to raise the objection upon its initial appearance. Fed. R. Civ. P. 12(g), (h)(1); *Rauch v. Day and Night Mfg. Corp.*, 576 F.2d 697, 701 (6th Cir. 1978). For these reasons, the district court had appropriate jurisdiction over this case.

III.

There is no dispute that both parties signed and agreed to the terms under both the Proposal and the Commitment, leaving the only remaining task for the district court one of contract

interpretation. The district court's grant of summary judgment in favor of Bridgestone was based on the plain language of the contracts. The district court held that on the face of these two documents, no binding lease had been created. We review a district court's decision to grant summary judgment *de novo*. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

There are three main issues in this case: (1) whether a binding lease was created between the two parties; (2) how the $38,000 payment should be characterized; and (3) what additional obligations Bridgestone is required to fulfill. For the following reasons, we conclude that (1) no binding lease was created, (2) the payment was a security deposit, and (3) no additional obligations remain for Bridgestone under either the Proposal or the Commitment.

A. *No Binding Lease Was Created Between the Parties*

Under North Carolina law, the first step in contract interpretation is ascertaining the original intentions of the parties.[1] *Jefferson-Pilot Life Ins. Co. v. Smith Helms Mulliss & Moore*, 429 S.E.2d 183, 186 (N.C. Ct. App. 1993). "If the plain language of a contract is clear, the [original] intention of the parties is inferred from the words of the contract." *Walton v. City of Raleigh*, 467 S.E.2d 410,

---

[1] In the event that the North Carolina Supreme Court has not addressed a question that arises in this case, we may look to decisions by the North Carolina Court of Appeals to anticipate how the North Carolina Supreme Court might rule on the issue. *Melson v. Prime Ins. Syndicate, Inc.*, — F.3d —, 2005 WL 3157966, at *4 (6th Cir. 2005).

411 (N.C. 1996). In the Proposal, it clearly states in the opening paragraph "this is a proposal only and not a commitment." Subsequently, in the Commitment, it states that "this commitment is subject to the execution of mutually acceptable lease documentation," thereby admitting that, at that point in the negotiations, the parties had not come to an agreement over the terms of the lease. Therefore, this Court may not impose the general terms described in the Proposal and the Commitment upon Bridgestone as a lease, because at the signing of both of these documents, neither party had come to accept these terms. In this respect, the two documents are plain and unambiguous and this Court may not add terms to these documents. *Wachovia Mortgage Co. v. Autry-Barker-Spurrier Real Estate, Inc.* 249 S.E.2d 727, 731 (N.C. Ct. App. 1978).

Harborside encourages this Court to consider the external actions of Bridgestone as proof that a lease was created between the two parties. However, this Court may not accept that evidence as true while ignoring the plain language of the signed documents. *See Metro. Prop. & Cas. Ins. Co. v. Lindquist*, 463 S.E.2d 574, 576 (N.C. Ct. App. 1995). The Commitment required between the parties mutually acceptable lease documentation, which was never created.

Additionally, Harborside argues that section 2A-204 of the Uniform Commercial Code is relevant in that it allows a lease to be created based solely on "conduct by both parties recogniz[ing] the existence of a lease contract." However, while a number of sections of the Uniform Commercial Code have been adopted into the North Carolina state statute, no part of section 2A has been incorporated. Our research did not reveal any North Carolina cases which cite to this section of the UCC as binding and Harborside has brought no such authority to our attention. Moreover, Harborside's argument still fails because neither party definitively took action in conformity with

the existence of a lease. As demonstrated in the facts, both parties continued negotiating the terms of the lease up to the date when Bridgestone informed Harborside of their desire to purchase the generators. Therefore, this argument must be rejected, and no lease was created between the two parties.

*B. Bridgestone Properly Forfeited the $38,000*

The next inquiry is whether the $38,000 payment was a non-refundable security deposit as Bridgestone contends or whether it was consideration for delivery of the Commitment as Harborside contends. This question may be answered by a detailed look at the plain language of the Security Deposit sections of the two documents in question. If this language is unambiguous, then no further inquiry is necessary. *Jefferson-Pilot Life Ins. Co.*, 429 S.E.2d at 186; *Walton*, 467 S.E.2d at 411. In the Proposal, the $38,000 payment became due when Bridgestone accepted Harborside's proposal. Under the Proposal terms, Bridgestone was entitled to a full refund if Harborside did not produce a commitment; Harborside was entitled to keep the money if a commitment was produced but Bridgestone did not "close the transaction."

In the Commitment, the Security Deposit section acknowledges Bridgestone's $38,000 payment and it removes the clause providing a refund for Bridgestone because Harborside did produce a commitment. The Commitment also reiterates the provision entitling Harborside to retain the security deposit if Bridgestone did not "close the transaction." This language contemplates the very situation that occurred in this case. Bridgestone did not "close the transaction" and its security deposit was forfeited to Harborside. In sum, the money acted as a security for Harborside should

Bridgestone choose to back out of the deal. For these reasons, the $38,000 payment by Bridgestone is properly characterized as a non-refundable security deposit.

*C. No Additional Obligations Remain for Bridgestone*

Having concluded that no binding lease was created and that forfeiture of the security deposit was appropriate, the only question left is what, if any, obligations remain for Bridgestone. "One of the chief purposes of contract law is to secure the realization of expectations reasonably induced by the expressions of agreement." *Joyner v. Adams*, 387 S.E.2d 235, 239 (N.C. Ct. App. 1990) (quotations and citations omitted). Upon review of the record, Harborside has been unable to show how Bridgestone's failure to agree to a lease economically injured them. Harborside cannot claim that it had some legal expectation to be compensated under a lease whose terms were yet to be finalized. Upon the two parties' agreement, Harborside took no detrimental action in reliance on the agreement. It made no payments to PowerSecure nor did it invest any other resources in the building process. Therefore, we cannot conclude that Bridgestone has any remaining obligation to Harborside.

IV.

Therefore, we AFFIRM the district court's judgment.